**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Homesite Insurance Company, | No. CV-21-00554-TUC-JGZ |
| Plaintiff, | **ORDER** |
| v. | |
| Zhen Jiang, | |
| Defendant. | |

Pending before the Court is Plaintiff Homesite Insurance Company's (Homesite) Motion for Summary Judgment. (Doc. 89.) Homesite seeks a judicial declaration that it is entitled to rescission of Defendant Zhen Jiang's homeowners' insurance policy pursuant to A.R.S. § 20-1109. (*Id.*) In the alternative, Homesite requests that the Court conclude there is no coverage under the vandalism and malicious mischief policy exclusion. (*Id.*) Additionally, Homesite requests that the Court enter summary judgment in its favor on Mr. Jiang's bad faith counterclaims. (*Id.*) The Motion is fully briefed. (Docs. 89, 90, 105, 106, 107, 108.) For the following reasons, the Court will enter summary judgment in favor of Homesite.

**I.     INTRODUCTION**

This is an insurance fraud case. Homesite asserts that Mr. Jiang misrepresented that the house located at 7617 East Snyder Road, Tucson, AZ 85750 (the Property) was his primary residence. Homesite asserts that Mr. Jiang never actually resided at the Property; it relied on Mr. Jiang's representation in issuing the homeowners' insurance policy (the

Policy); and Mr. Jiang's misrepresentation was material because Homesite does not, and would not, insure a vacant home. Mr. Jiang maintains that the Property was his primary residence, he lived at the residence, and the insurance representatives acted in bad faith when investigating and processing his claim.

## II.   FACTS

### 1.  The Property

Mr. Jiang is a "real estate investor," (DSOF ¶ 86),[1] who owns properties in Arizona and Texas. (Doc. 94-5 at 3; DSOF ¶¶ 71–82.) In early 2018, Mr. Jiang bought the Property, a five-bedroom single-family residence located on four acres at 7617 East Snyder Road. (PSOF ¶¶ 1, 13; DSOF ¶¶ 1, 13; Doc. 90-10 at 3.) The Property had been vacant since the previous owners, the Varnums, lost the Property to foreclosure in 2014. (PSOF ¶¶ 10, 12; DSOF ¶¶ 10, 12.) The Varnums left behind some items, including financial documents related to their business. (PSOF ¶ 11; DSOF ¶ 11.)

### 2.  Mr. Jiang's insurance application and Policy

In November 2019, Mr. Jiang applied for homeowners' insurance for the Property through GEICO Insurance Agency. (PSOF ¶ 18; Doc. 90-5 at 20; Verified Answer, Doc. 9 at ¶ 8.) In his application, Mr. Jiang represented that the Property was his primary residence and that the information provided in the application was truthful and accurate. (PSOF ¶¶ 19–20; Doc. 90-5 at 2, 4; Verified Answer Doc. 9 at ¶¶ 9–10.) Typically, GEICO refers insurance applications for primary residences to Homesite. (PSOF ¶ 24; Doc. 90-9 at 8.) Homesite does not underwrite homeowners' policies for vacant homes because "a vacant home is going to be more susceptible to theft, vandalism, anything that would come with an unoccupied empty house." (PSOF ¶ 26; Doc. 90-9 at 8.) Based on Mr. Jiang's representation that the Property was his primary residence, GEICO referred his application to Homesite for underwriting. (PSOF ¶¶ 21–22; Doc. 90-9 at 8–9.)

GEICO issued Mr. Jiang a homeowners' insurance Policy underwritten by Homesite for the period of November 30, 2019 through November 30, 2020. (PSOF ¶¶ 27–28; Doc.

---

[1] The Court refers to Homesite's Statement of Facts (Doc. 90) as "PSOF" and Mr. Jiang's Statement of Facts (Doc. 105) as "DSOF."

90-6 at 4.) The "Important Messages" section of the Policy states "[w]e relied on the information you provided to underwrite and issue your insurance policy." (PSOF ¶ 28; Doc. 90-6 at 6.) The "Important Messages" section continues: "Please review your 'Declarations' page and check the description of your dwelling, [and] occupancy... If any of this information needs to be corrected, you must advise us within 30 days of receipt." (PSOF ¶ 29; Doc. 90-6 at 6.) The "Important Messages" section continues: "You stated that: you occupy the insured property…" (PSOF ¶ 30; Doc. 90-6 at 6.) The Declarations page shows the Property is a "primary residence." (PSOF ¶ 31; Doc. 90-6 at 4.)

The "Concealment or Fraud" section of the Policy states "[w]e provide coverage to no 'insureds' under this policy if, whether before or after a loss, an 'insured' has: 1. [i]ntentionally concealed or misrepresented any material fact or circumstance; 2. [e]ngaged in fraudulent conduct; or 3. [m]ade false statements; relating to this insurance." (PSOF ¶ 36; DSOF ¶ 36; Doc. 90-6 at 38.)

On December 3, 2019, the Policy was mailed to Mr. Jiang at the Property's Snyder Road address. (Doc. 90-6 at 2.) Mr. Jiang claims he never received the Policy and had to request a copy of the Policy; he does not state when he obtained the copy. (DSOF at 5.)

### 3. The Pima County Sheriff's March 21, 2020 report

On March 21, 2020, the Pima County Sheriff's Department responded to a call of vandalism at the Property. (PSOF ¶ 37; DSOF ¶ 37; Doc. 90-12 at 8.)[2] According to the police report, deputies who arrived at the scene observed extensive damage throughout the house. (Doc. 90-12 at 8–14.) Vandals had set off fireworks inside the Property, graffitied and put holes in the walls, started fires, and broke numerous windows. (PSOF ¶ 38; DSOF ¶ 38; Doc. 90-12 at 8.) The floor of the residence was covered with a thick layer of soot—

---

[2] The Sheriff's Department report describes the officers entry into the Property as follows:
> As we initially stepped into the residence, it was observed that the floor was covered with a thick layer of soot. Every room that we had gone into in the residence was covered in soot in a similar way. There was also an enormous amount of glass shattered on the floor being light bulbs and windows and other pieces of glass and light fixtures.

(Doc. 90-12 at 12.) After some investigation the officers exited the residence "[d]ue to the hazardous conditions of the residence, the unknown structural integrity and the fact that it was getting more increasingly difficult to breathe." (*Id*. at 13.)

"[e]very room that we had gone into in the residence was covered in soot in a similar way[,]" including the rooms upstairs, and multiple areas had extensive fire damage. (PSOF ¶¶ 42–43; DSOF ¶¶ 42–43; Doc. 90-12 at 8.) The windows upstairs were shattered "and all of the bathrooms and rooms were extensively damaged by the fire." (PSOF ¶ 43; DSOF ¶ 43; Doc. 90-12 at 13.) The basement, which was once a home theatre, had been "burned all the way to the ground." (PSOF ¶ 41; DSOF ¶ 41; Doc. 90-12 at 13.) The police report states: "due to the residence being vacant for approximately six years, it appeared as the residence had been ransacked and either squatted on or lived in by squatters at some point in time." (PSOF ¶ 44; DSOF ¶ 44; Doc. 90-12 at 13.)

Per the police report, two neighbors witnessed kids playing Airsoft in the residence in January 2020. One of the neighbors checked on the Property and noted that there was damage to the windows and fire damage to the inside. The neighbor believed [the damage] possibly happened in December 2019. (PSOF ¶¶ 35–46; DSOF ¶¶ 35–46; Doc. 90-12 at 13–14.)

The investigating officers were unsuccessful in contacting Mr. Jiang about the damage to his Property in March 2020. (PSOF ¶ 57; DSOF ¶ 57; Doc. 90-12 at 11, 14–15.) Mr. Jiang did not contact Homesite to report vandalism damage at the Property until October 29, 2020, seven months later. (PSOF ¶ 70; DSOF ¶ 70; Ex. 17.)

### 4. Mr. Jiang's neighbor's statements

The March 21, 2020 call to police was made by neighbor Morgan Hay, son-in-law of the Varnums. (PSOF ¶ 48; DSOF ¶ 48; Doc. 90-12 at 10.) Mr. Hay told officers that the burned papers inside the Property were financial documents left behind by the Varnums. (PSOF ¶ 49; DSOF ¶ 49; Doc. 90-12 at 12.) Mr. Hay stated that the damage to the Property possibly occurred over New Years. (PSOF ¶ 50; Doc. 90-12 at 10.) Mr. Hay informed officers that Mr. Jiang "would show up from time to time and ask Mr. Hay to check on the house periodically; however, nobody had occupied that residence since it was foreclosed upon in 2014." (PSOF ¶ 51; Doc. 90-12 at 11.)[3]

---

[3] Mr. Jiang admits that he asked and that neighbors "promised [him] that they would report to police immediately, if they [saw] anyone causing any damages." (DSOF ¶¶ 37–58.)

Neighbor Keld Sorensen testified that no one had lived in the Property since he moved into his home in 2016. (PSOF ¶ 55; Doc. 90-3 at 2, 4, 6.) Mr. Sorensen stated of the Property, "it's pretty well known in the area that the house is abandoned." (PSOF ¶ 92; Doc. 90-3 at 9.)

Neighbor Daniel Uvaydov stated the home had been vacant since Mr. Jiang purchased it. (PSOF ¶ 56; Doc. 90-8 at 7.)

Neighbors Kelly and Chip McLaughlin testified that no one had lived in the Property since 2014. (PSOF ¶ 53; Docs. 90-1, 90-2.) Mrs. McLaughlin testified that she had observed the damage described in the March 2020 police report in December 2019. (PSOF ¶ 61; Doc. 90-1 at 8.) Mrs. McLaughlin testified that she and her family walked into the Property through the front door and observed the holes in the walls, the fire damage, and the incinerated basement. (PSOF ¶¶ 61–66; Doc. 90-1 at 8.) Mr. McLaughlin stated that based on his personal observations, no one occupied the Property from 2014 until 2023. (PSOF ¶ 54; Doc. 90-2 at 14.) Mr. McLaughlin testified that he believed the March 2020 police photos did not depict the aftermath of one particular incident, but rather the culmination of months or years of repeated incidents. (PSOF ¶ 68; Doc. 90-2 at 11–12.)

Mr. Jiang disputes the accuracy of his neighbors' statements about the Property being vacant or abandoned. (DSOF ¶¶ 37–58.) He states that some of his neighbors did not want Mr. Jiang and his family on the Property, made his family's life miserable, and he and his family were not welcome in the subdivision. (DSOF ¶ 17; DSOF ¶¶ 90–93.) Mr. Jiang surmises that "[b]efore the March 2020 incident, there were no police calls from 2018 to early 2020, because there were no damages." (DSOF ¶¶ 37–58.)  But he also states he "had no way to know exact[ly] what date the damage happened in the month of March." (DSOF ¶¶ 59–67.) And it is undisputed that he did not contact Homesite to report vandalism damage at the Property until October 29, 2020. (PSOF ¶ 70; DSOF ¶ 70; Ex. 17.)

**5. Subsequent reports and investigations**

    a. <u>The Pima County DEQ investigation</u>

On September 8, 2020, over a month before Mr. Jiang reported the damage to

Homesite, Mrs. McLaughlin reported the Property to the Pima County Department of Environmental Quality (DEQ). (PSOF ¶ 94; Doc. 92 at 11.) In her complaint, Mrs. McLaughlin stated the "[h]ouse has been abandoned for years." (PSOF ¶ 95; Doc. 92 at 11.) DEQ inspected and photographed the Property on September 11, 2020, and found the doorways were unsecured, windows were broken, and "[t]he property appears abandoned…" (PSOF ¶ 96; Doc. 92 at 12.)[4] DEQ's photographs showed a notice by Sandra Glockner, the Long Realty agent who listed the Property for sale after the Varnums' foreclosure, taped up in a window of the Property, and burned paperwork from the Varnums' previous business in the living room. (PSOF ¶¶ 97–98; Doc. 92 at 15.)

      b. Pima County Sheriff report

On October 17, 2020, the Pima County Sherriff's office was again called to the Property by neighbors in response to claims of suspicious activity at the Property. (PSOF ¶¶ 90–91; Doc. 91-45 at 11.)

      c. Homesite's investigation

On October 29, 2020, Mr. Jiang contacted Homesite to report vandalism damage at the Property. (PSOF ¶ 70; DSOF ¶ 70; Ex. 17.) In recorded phone conversations with Homesite, Mr. Jiang maintained that the Property was his primary residence, and explained that he had not been at the Property for "a couple of weeks," but that he did live there. (PSOF ¶¶ 71–72, 75, 113–114; DSOF ¶¶ 71–82, 113.) Homesite investigated Mr. Jiang's claim. (PSOF ¶ 84; Doc. 90-11.) In April 2021, Homesite inspected and photographed the Property and observed that the toilets were still taped shut and that there was no furniture. (PSOF ¶ 84; DSOF ¶¶ 83–84; Doc. 90-11.)

On December 29, 2021, Homesite sent Mr. Jiang a letter rescinding the Policy and refunding his premiums on the basis that the Property was not Mr. Jiang's primary residence and he did not live there. (PSOF ¶ 89; Doc. 90-7.)

    **6. Utility usage and the 7th Street Apartment**

---

[4] Mr. Jiang states that the complaints to DEQ "misled the county with many Made up things and wrong info about the home and homeowner, like where they lived and the history." (DSOF ¶¶ 94–111.) Mr. Jiang does not dispute that when Pima County DEQ inspected the property, the doors to the property were open. (DSOF ¶ 112.)

- 6 -

In response to interrogatories, Mr. Jiang identified 23 properties that he rented, owned, or resided in from January 1, 2016 to the present. (PSOF ¶ 123; Doc. 94-5 at 2–3.) Mr. Jiang failed to disclose a 24th property, an apartment located at 1215 E. 7th St., Tucson, AZ 85719 (the "7th Street Apartment"). (PSOF ¶ 124; Doc. 93 at 12.)[5]

Mr. Jiang signed a lease for the 7th Street Apartment for the period of July 15, 2019 to May 15, 2020, and subsequently extended the lease until May 15, 2023. (PSOF ¶¶ 125–27; Doc. 94-3.) Mr. Jiang was the sole tenant listed in the lease, which prohibited him from allowing any other person to occupy the premises. (Doc. 94-3 at 14.)

Documents pertaining to the rental show that Mr. Jiang resided at the 7th Street Apartment from July 2019 to at least April 2021. In a July 18, 2019 Property Inspection Checklist Addendum, Mr. Jiang listed defects in the Apartment and noted that the pictures provided were taken "before move in." (Doc. 94-3 at 10–11.) In April 2021, Mr. Jiang texted with the property manager regarding maintenance and repair issues. (PSOF ¶ 128; Doc. 94-3 at 31–36; Doc. 94-4 at 1–5.)

The Tucson Electric and Power (TEP) records for the 7th Street Apartment show normal, consistent electricity usage and routine payment to TEP by Mr. Jiang from at least August 2019 through at least January 2021. (PSOF ¶ 129; Doc. 93 at 12.) In contrast, the utility records for the Property show zero usage from April 2019 through December 2020. (PSOF ¶ 83; Doc. 93 at 15).

Mr. Jiang does not dispute that the utility records show zero power usage at the Property from April 2019 through December 2020. (DSOF ¶¶ 83–84.) He states that he had been "living an off-grid lifestyle" and "not using power" for years. (DSOF ¶¶ 83–84.)

---

[5] Mr. Jiang denies that he concealed the 7th Street Apartment. (DSOF at 14, ¶¶ 123–29.) But the Apartment is clearly absent from the list of properties that "he rented, owned, or resided in from January 1, 2016 to the present." (Doc. 94-5 at 2–3.) Notably, despite moving into the 7th Street Apartment in July 2019, Mr. Jiang also did not disclose the 7th Street Apartment in his November 2019 application for homeowners' insurance in response to a question which asked if he had moved to a new home in the last six months. (Doc. 90-5 at 20.) Instead he disclosed his earlier apartment located at 1776 S. Palo Verde Avenue —the same apartment he listed as his "current address" in his June 4, 2019 application for the 7th Street Apartment. (Doc. 94-3 at 5.) Thus, although Mr. Jiang had moved into the 7th Street Apartment after leaving the Palo Verde apartment, he represented to Homesite that the Palo Verde Apartment was his prior residence.

He claims that the toilets on the Property were taped shut because "[he and his family] were using small portable toilets, which [were] also called camping toilets or cassette toilets." (DSOF ¶ 84.) Mr. Jiang also states that his family camped in tents on the Property. (DSOF ¶ 116.)

Mr. Jiang states that he rented the 7th Street Apartment for his parents. (DSOF ¶¶ 123–29.) The 7th Street Apartment lease lists Mr. Jiang as the only tenant. (Doc. 94-3 at 14.) Mr. Jiang states that his parents paid for the rental. (DSOF ¶¶ 123–29.) The landlord's records show that monthly rental payments were made using checks in Mr. Jiang's name and signed by Mr. Jiang. (Doc. 94-3 at 4.) And, as noted above, Mr. Jiang texted with the landlord about necessary repairs to the Apartment.

Mr. Jiang does not dispute that the real estate agent's 2018 listing for the Property was still taped in the window of the Property during Homesite's April 2021 investigation, but he asserts that in 2018 his mother taped a no trespassing sign over the listing and that the listing was exposed after the no trespassing sign was tossed away. (DSOF ¶ 97.) Mr. Jiang states that his mother taped new signs there a few times, and they were thrown away many times. (DSOF ¶ 97.) Mr. Jiang does not state who threw the signs away or why it would be necessary to continue to post no trespassing signs after he moved into the Property.

**7. Mr. Jiang's statements regarding occupancy**

Mr. Jiang has provided numerous inconsistent statements as to when, if ever, he lived at the Property. In November 2021, Mr. Jiang told Homesite that he had not been at the Property for "a couple of weeks," but that he did live there, and it was his primary residence. (PSOF ¶¶ 71–72, 75, 113–14; DSOF ¶¶ 71–82, 113.) In response to requests for admission, Mr. Jiang averred that he left the Property in February 2020 to live with his mother due to the pandemic and that he did not return until October 29, 2020. (PSOF ¶ 88.) He claims that he contacted insurance agents during the pandemic lockdown period and asked if he needed to make changes to the policy; they said no and promised him the home would still be covered. (Doc. 106 at 3; DSOF ¶ 88.) In his Opposition, he states that he lived in the home from late 2019 until early 2020, and that the home was not vacant for

more than 60 days prior to the March 21, 2020 fire. (Doc. 106 at 4.)

Mr. Jiang asserts the Property was not vacant when his mother, father, and sister all "slept/camped" there "many times before." (DSOF ¶ 12.) Mr. Jiang does not provide any specific date that his mother, father, and sister stayed at the Property.

As proof that he resided at the Property, Mr. Jiang states he had personal property at the residence (a cot and appliances—microwave, mini fridge, rice cooker, slow cooker, blender, toaster, kettles) and that he has pictures showing exactly the same property from a previous residence. (Doc. 106 at 6.) Mr. Jiang also asserts that food in the home that was burnt was food bought by his mother, including yoga bottles, milk bottles, and egg containers with expiration dates for early 2020 and late 2019. (*Id.*) The house, however, had no electricity to keep such food items cold. In a seller disclosure addendum, the Property's listing states: "Utilities can not be activated for inspections due to damaged electrical and plumbing systems including but not limited to missing copper." (PSOF ¶ 15.) According to Mr. Jiang, one of the first things he told the insurance agents was that he needed to work on the electrical and plumbing systems, and he would be using solar and would not have electricity usage from the meter. (DSOF ¶ 15.) Mr. Jiang suggests that there was no furniture in the Property because it was "burned or stolen." (DSOF ¶ 84.) He does not specify whether the furniture was burned or whether it was stolen, what furniture was lost, or how he knows what happened to the furniture. As noted above, at one time he admitted that he was not at the residence after February 2022. (PSOF ¶ 88.)

**III.    SUMMARY JUDGMENT STANDARD**

To obtain summary judgment, the moving party must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The type of showing required," however, "depends on who has the burden of proof." *Cabral v. State Farm Fire & Cas. Co.*, 582 F. Supp. 3d 701, 707 (D. Ariz. 2022) (quoting S. Gensler & L. Mulligan, Federal Rules of Civil Procedure, Rules and Commentary at 152 (2021)).

When the moving party bears the burden of proof at trial, its showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the

- 9 -

moving party. *Id.* (quoting *Leone v. Owsley*, 810 F.3d 1149 (10th Cir. 2015)). The moving party must "lay out the elements of the claim, cite the facts which it believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Id.* (quoting *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015)). Once the moving party has carried its burden under Rule 56(c), the burden shifts to the non-moving party to present evidence that raises a "genuine" issue of fact. Fed. R. Civ. P. 56(a). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cabral*, 582 F. Supp. 3d at 707 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Summary judgment is also warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Id.* at 587. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Id.* (citing Advisory Committee Note to 1963 Amendment of Fed.R.Civ.P. 56(e)). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Id.*

IV.   **DISCUSSION**

   1. **Recission of the Policy is appropriate under A.R.S. § 20-1109.**

Under A.R.S. § 20-1109, an insurer is entitled to statutory rescission of an insurance policy if, in the insurance application, the insured makes fraudulent misrepresentations, omissions, or conceals facts that were material to the insurer's acceptance of the risk.

Further, the statute requires a showing that the insurer, in good faith, would not have issued the policy, would not have issued the policy in as large an amount, or would not have covered the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise. *Id.* at § 20-1109(3).

Fraudulent misstatements, omissions, or concealment of facts can be established by proving either legal fraud or actual fraud. *Valley Farms, Ltd. v. Transcon. Ins. Co.*, 206 Ariz. 349, 353 (Ct. App. 2003). Legal fraud exists "if the question asked in an insurance application: (1) is one where the facts are within the personal knowledge of the insured; (2) are such that the insurer would naturally have contemplated that the answers represented the actual facts; and (3) the answers are false." *Golden Rule Ins. Co. v. Montgomery*, 435 F. Supp. 2d 980, 995 (D. Ariz. 2006) (citing *Valley Farms*, 206 Ariz. at 353). Legal fraud does not require an intent to deceive. *Russell v. Royal Maccabees Life Ins. Co.*, 193 Ariz. 464, 471 (Ct. App. 1998).

In his application for insurance, Mr. Jiang represented that the Property was his primary residence and that the information provided in the application was "truthful and accurate." (PSOF ¶¶ 19–20; Doc. 90-5 at 2, 4; Verified Answer Doc. 9 at ¶¶ 9–10.) Whether the Property was his primary residence was a fact that was within Mr. Jiang's personal knowledge.

Mr. Jiang's representation that the Property was his primary residence was material to Homesite's decision to underwrite and issue the Policy, how much coverage to provide, and the premium charged. Homesite does not underwrite homeowners' policies for vacant homes because "a vacant home is going to be more susceptible to theft, vandalism, anything that would come with an unoccupied empty house." Homesite would not have issued the Policy to Mr. Jiang had it known that the Property was not owner occupied.

The Policy itself made clear that Homesite relied on Mr. Jiang's representations in its decision to underwrite and issue coverage. It stated, "[w]e relied on the information you provided to underwrite and issue your insurance policy." (PSOF ¶ 28; Doc. 90-6 at 6.) The Policy confirmed that the Property was a "primary residence" and "owner occupied" and directed Mr. Jiang to contact Homesite within thirty days if the information contained in

the Policy was incorrect. (PSOF ¶¶ 29–31; Doc. 90-6 at 6.) Mr. Jiang did not contact Homesite to correct that information. The Policy was sent to him at the address of the Property where he claims that he was living.

Homesite has established that the Property was not Mr. Jiang's primary residence. No reasonable juror could conclude otherwise based upon the evidence that he lived elsewhere, the condition of the Property, the reports of his neighbors, and the fact that he was apparently unaware of the vandalism occurring on the Property until late October 2020. Neighbors, Morgan Hay, Keld Sorensen, Daniel Uvaydov, and Kelly and Chip McLaughlin testified that no one had occupied or resided on the Property since the Varnums left in 2014. (PSOF ¶¶ 51, 53–56, 94–95.) Mr. Hay informed police that Mr. Jiang "asked him to check on the house periodically," (PSOF ¶ 51; Doc. 90-12 at 11), a fact that Mr. Jiang confirms. (DSOF ¶¶ 37–58 ("Neighbors promise[d] that they would report to police immediately if they see anyone causing damage.").)

The extensive damage to the Property appears to have occurred over a matter of months or years rather than a single night like Mr. Jiang claims. Mr. McLaughlin testified the March 2020 police photos depicted an accumulation of months or years of repeated incidents. (PSOF ¶ 68.) Mrs. McLaughlin testified the March 2020 police photos reflect damage that had occurred at least four months earlier. (PSOF ¶¶ 61–66.) The police report stated: "due to the residence being vacant for approximately six years, it appeared as the residence had been ransacked and either squatted on or lived in by squatters at some point in time." (PSOF ¶ 44.)

In September 2020, Pima County DEQ inspected the Property and found that the doorways were unsecured, windows were broken, and "[t]he property appear[ed] abandoned…" (PSOF ¶ 96.) Mr. Jiang does not dispute that when Pima County DEQ inspected the property, the doors to the property were open. (DSOF ¶ 112.) The DEQ's inspection showed that the Property still contained the burned papers belonging to the Varnums and Ms. Glockner's listing notice from when Mr. Jiang bought the Property in February 2018. (PSOF ¶¶ 14, 49, 97–98.) Both are indications that Mr. Jiang had never lived at the Property.

Mr. Jiang did not report the damage to the Property until October 29, 2020, more than seven months after the March 21, 2020 police report. (PSOF ¶ 70; DSOF ¶ 70.) During those seven months, police were called to the property and an additional police report was authored on October 17, 2020. (PSOF ¶ 90.)

TEP records show nearly zero electricity usage at the Property from at least April 2019 to December 2020. (PSOF ¶ 83.) During that same time period, Mr. Jiang had leased an apartment on 7th Street, and records show consistent electricity usage and payment of rent by Mr. Jiang for the apartment as well as requests for repairs by Mr. Jiang. (PSOF ¶¶ 125–27.)

Mr. Jiang's contradicting statements that he lived at the Property during various time periods fail to establish a genuine issue for trial. No reasonable juror would credit his statements because they are inconsistent and refuted by all of the other evidence, including the 7th Street Apartment documents, the police reports, the neighbors' reports, and the condition of the Property. The March 2020 Sheriff's report (Docs. 90-13–90-51), the September 2020 DEQ report (Doc. 92), and the April 2021 Homesite report (Doc. 90-11) include photographs of the Property showing the extensive damage, including broken windows, trash, graffiti, holes in the walls, and a thick layer of soot. The photographs undercut Mr. Jiang's claim that the damage to the Property happened in March while he was away from the residence for a short period of time. The photographs further demonstrate that the Property was uninhabitable.

Mr. Jiang is not credible for the additional reason that he concealed his lease at the 7th Street Apartment during discovery. The rental agreement, which was subpoenaed from the property manager, shows that Mr. Jiang was the sole tenant listed in the lease and that the lease prohibited other persons from occupying the premises. Mr. Jiang communicated with his landlord about lease renewals and repairs and paid the monthly rent using checks in his name. The TEP records show normal utility usage at the 7th Street Apartment, despite Mr. Jiang's statement that he had been living "off-grid" for years.

Mr. Jiang claims that the perishable groceries found at the Property establish that he

lived there full-time. This contradicts Mr. Jiang's alleged "off-grid" lifestyle, in which he used no power or electricity such as a refrigerator to preserve perishable food items, and his assertion is insufficient to raise a material issue of fact given that there was no electricity at the Property and given the condition of the Property.

There is no reasonable explanation for Mr. Jiang's asking the neighbors to keep an eye on the property and posting no trespassing signs (which were repeatedly taken down) if he was occupying the Property.

Mr. Jiang does not know when the damage to the Property occurred because he was not living there. He claims, without any support, that the damage occurred in March 2020—the date of the Pima County Sheriff's report. However, he did not notify Homesite of the damage until October 2020, more than seven months later. And the Pima County Sheriff's Office could not find him to notify him in March 2020. Moreover, in this same time period, two additional reports were issued: one by the Pima County DEQ on September 11, 2020 and another by the Pima County Sheriff on October 17, 2020. All of these reports concluded that the property was vacant or abandoned. A person residing at the Property would have been aware of these three investigations and inspections of the Property.

Finally, Mr. Jiang asserted that he planned to "come back" to the Property in March or April of 2020, however, he "could not predict the pandemic." He says that he called Homesite to ask about changing his policy and was promised that the Property was "still covered." This statement contradicts Mr. Jiang's earlier statement that he was residing at the Property full time. Mr. Jiang has not established that a reasonable juror could find that he resided at the Property at any time.

Mr. Jiang's misrepresentation in the insurance application that the Property was his primary residence, and his failure to correct the Policy's terms stating that he occupied the Property as his primary residence, constitute legal fraud. The misrepresentation was material to Homesite's underwriting and issuance of the Policy, as it would not have issued the Policy had it known the Property was unoccupied. The Court agrees that statutory

rescission is proper and will enter summary judgment in favor of Homesite.[6]

### 2. Homesite did not act in bad faith in investigating and processing Mr. Jiang's claim.

Mr. Jiang asserts two counterclaims against Homesite: breach of the covenant of good faith and fair dealing and bad faith claims handling. The two claims are premised on the same allegation—that Homesite failed to conduct an adequate investigation and pay the claim. (Doc. 9 at ¶¶ 117–20 (breach of covenant); ¶¶ 123–27 (bad faith).)

A two-part test is used to determine whether an insurer acts in bad faith in investigating, evaluating, and processing a claim. There must be sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, (1) the insurer acted unreasonably toward the insured and (2) the insurer "acted knowing that it was acting unreasonably or acted with such reckless disregard that such knowledge may be imputed to it." *Inscription Canyon Ranch Sanitary Dist. v. Am. Alt. Ins. Corp.*, No. CV-12-8019-PCT-SMM, 2013 WL 5200169, at *5 (D. Ariz. Sept. 16, 2013).

Mr. Jiang asserts that Homesite's investigation was "cursory, outcome-oriented, and grossly inadequate as a basis for denial of coverage for the Claim." (Doc. 106 at 18.) Mr. Jiang offers no evidence or specific facts in support of this conclusion. Further, Mr. Jiang failed to respond to Homesite's Request for Admission asking him to admit Homesite had a reasonable basis to dispute coverage, its investigation was reasonable, and that he has no factual or legal basis for his bad faith claims. (PSOF ¶ 137(1)–(3).) Pursuant to Federal Rule of Civil Procedure 36(a)(3), "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Mr. Jiang's failure to respond is an admission that Homesite's investigation was reasonable. Finally, the evidence provided by Homesite suggests that its investigation and processing

---

[6] Because the Court concludes that Homesite is entitled to recission of the Policy under A.R.S. § 20-1109, the Court does not address Homesite's alternative argument in support of summary judgment.

of the claim was reasonable, and Mr. Jiang fails to present any evidence to the contrary. Therefore, the Court will enter summary judgement in favor of Homesite on Mr. Jiang's bad faith counterclaims.

## V.  CONCLUSION

For the foregoing reasons, Homesite is entitled to rescission of the Policy pursuant to A.R.S. § 20-1109, and entry of judgment on Mr. Jiang's counterclaims.

**IT IS ORDERED** Plaintiff Homesite's Motion for Summary Judgment (Doc. 89) is **granted**.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment in favor of Plaintiff Homesite (1) declaring that Homesite is entitled to rescission of the Policy and (2) granting judgment in favor of Homesite on Defendant Jiang's counterclaims.

The Clerk of Court is directed to close this case.

Dated this 16th day of September, 2024.

*[signature]*
Honorable Jennifer G. Zipps
United States District Judge